STATE of Alaska, Appellant,

v.

Jolene FELIX, Pamela Fain, and Sigmund T. Buchanan, Appellees.

Nos. A–7885, A–7886, A–7887.

Court of Appeals of Alaska.

July 12, 2002.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

No direct appearance for Appellees.

Quinlan Steiner, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, Amicus Curiae aligned with the Appellees.

Before COATS, Chief Judge, and
MANNHEIMER and STEWART, Judges.

### OPINION

MANNHEIMER, Judge.

In two of these three consolidated appeals, the district court granted prisoners' requests for a short-term release from prison so that they could attend to personal business. In the third appeal, the district court not only granted a prisoner two short releases from custody, but later ordered that the prisoner be released from custody so that she could spend the remainder of her sentence in a treatment facility.

In the first two cases (the appeals involving Pamela Fain and Sigmund T. Buchanan), the district court judges declared that they were modifying the prisoners' sentences by granting them "periodic imprisonment" under AS 12.55.015(a)(3). In the remaining case (the appeal involving Jolene Felix), the magistrate stated that he was not ordering periodic imprisonment; rather, he was modifying the prisoner's sentence "in the interest of fairness".

The State appeals all three cases. The State contends that, under the guise of granting "periodic imprisonment" or sentence modification, the district court has arrogated to itself the power to grant prison furloughs—a power that can only be exercised by the Classification Committee of the Department of Corrections. The Alaska Public Defender Agency, appearing as *amicus curiae* aligned with the appellees, argues that the district court was not granting furloughs but was instead exercising its lawful power to modify a criminal sentence, a power granted by Alaska Criminal Rule 35(b). The Public Defender Agency contends that each of the three prisoners demonstrated good cause for the court to alter their sentences by granting them periodic imprisonment— *i.e.*, splitting their prison terms into segments, separated by interludes of freedom.

█ In all three cases, the defendants have already enjoyed their periods of freedom and have completed their sentences. Thus, the State's appeals are moot. However, because the issue is important, and because the judicial actions that the State challenges are capable of repetition and likely to escape review if we insist on strict application of the mootness doctrine; we will reach the merits of the State's appeal.[1]

Each of these three cases rests on different facts, so our analysis of each case is a little different. In general, though, we agree with the State that the district court has improperly interfered in matters that are, by law, entrusted to the discretion of the Department of Corrections.

*The underlying facts of these three appeals*

*The Felix appeal, No. A–7885.*

Jolene Felix pleaded no contest to refusing to submit to a breath test and leaving the scene of an accident. On November 20, 2000, she was sentenced to a composite term of 240 days' imprisonment with 155 days suspended—85 days to serve.

One week later, on November 27th, Felix filed a motion asking the district court (1) to release her from custody for one day so that she could "obtain clothing for her child", and (2) to release her again "for a few days at Christmas". Felix's attorney labeled this motion a "request for periodic sentence".

Magistrate Patrick S. Hammers held a hearing on Felix's motion on November 29th. At that time, Felix withdrew her request to be released at Christmas. Instead, she asked to be released for a short time to arrange substance abuse treatment at the Old Minto Family Recovery Camp, a program run by the Tanana Chiefs.

Magistrate Hammers declared that he would allow Felix two days' liberty "to get her affairs in order". He stated that he was not exercising his power under Criminal Rule 35(b) to modify Felix's sentence to one of periodic imprisonment. Rather, he declared that he was adjusting Felix's sentence "in the interest of fairness" because he had told Felix at the original sentencing hearing that he would give her time to take care of her affairs, but had been unable to do so because Felix could not arrange a suitable third-party custodian at that time.

Felix had arranged a screening appointment with the Tanana Chiefs for 1:00 p.m. the next day (November 30th), so Magistrate Hammers ordered that her two days of liberty would begin at 8:00 a.m. on the 30th. The magistrate directed Felix to return to the Fairbanks Correctional Center and surrender herself to custody no later than 5:00 p.m. on December 1st. However, the magistrate placed stringent conditions on Felix's release: she was to remain within the immediate

---

**1.** *See State v. Couch,* 991 P.2d 1286, 1287 (Alaska App.1999) (applying this exception to the mootness doctrine in similar circumstances).

presence of a third-party custodian for 24 hours a day, and she was ordered not to drive a vehicle or drink alcoholic beverages. Thus, even though Felix was ostensibly granted an interval of liberty between periods of imprisonment, her release looked like traditional bail release—except that Felix was a sentenced prisoner with no right to bail.

On December 6th, Felix's attorney informed Magistrate Hammers that Felix had been accepted at the Old Minto Recovery Camp. He asked the magistrate to "release [Felix] to treatment"—*i.e.*, to allow Felix to "serve out the balance of her sentence at [the Old Minto] residential [treatment] program". Again, Felix's attorney asserted that this release would amount to a sentence of "periodic imprisonment". The defense attorney argued that, under Criminal Rule 35(b), the court had the authority to modify Felix's sentence in this manner.

The State opposed Felix's request, arguing that Felix was really seeking a treatment furlough and that only the Department of Corrections had the authority to grant furloughs.

Without resolving this dispute between "periodic imprisonment" and "furlough", Magistrate Hammers declared that he had the authority to modify Felix's sentence and require that the balance of it be spent at the Old Minto Camp. He then ordered that Felix be released for one day (between 7:00 a.m. on December 21st and 8:00 a.m. on December 22nd) so that she could obtain the physical examination required for entrance into the Old Minto Camp treatment program. Again, this one day's release resembled bail release: Felix was required to be in the continuous custody of a third-party custodian, and she was ordered to neither drive nor drink.

According to Magistrate Hammers's order, Felix was to return to custody at the Fairbanks Correctional Center from December 22nd until December 27th. Then, on the morning of December 27th, she would be released yet again—this time, to spend the remainder of her sentence at the Old Minto Recovery Camp. Felix was told that, following her release on the morning of the 27th, she was to go directly to the airport and travel to the Old Minto Camp. She was to supply the court with proof of her successful completion of the treatment program by February 23, 2001.

In early February, the district court received notification from the Tanana Chiefs that Felix had successfully completed the Old Minto Camp treatment program on January 31, 2001. Based on this news, Magistrate Hammers issued an amended judgement on February 14th. The amended judgement listed the same composite sentence, but added that Felix "will be given day-for-day credit towards jail time for attending the Old Minto Recovery Camp and complying with their recommendations and treatment. Proof of compliance is to be provided to the court no later than February 23, 2001." (*Sic:* As just explained, Felix had already provided proof of compliance, and this is what prompted the magistrate to issue the amended judgement.)

### *The Fain appeal, No. A–7886.*

Pamela M. Fain pleaded no contest to third-degree theft. On August 16, 2000, she was sentenced to 180 days' imprisonment with 150 days suspended—30 days to serve. She was allowed to delay commencement of this sentence until November 3rd.

On December 3rd, with 11 days left to serve, Fain asked the district court to exercise its authority under Criminal Rule 35(b) and modify her sentence by releasing her from custody on December 5th so that she could (1) keep a doctor's appointment on December 13th, and (2) arrange alternative child care for her son. (The woman who had been caring for Fain's son had become seriously ill.) Fain asked the court to allow her to remain at liberty for approximately six weeks, resuming service of her sentence on January 31st.

On December 5th, District Court Judge Winston Burbank rejected most of Fain's request. However, he did order Fain released from jail for four days to take care of her son. Fain was directed to surrender herself at the end of the four days and complete her sentence.

*The Buchanan appeal, No. A–7887.*

Sigmund T. Buchanan pleaded no contest to two counts of reckless driving, failing to stop at the direction of a police officer, and resisting arrest. On November 8, 2000, he was sentenced to a composite term of 625 days' imprisonment with 540 days suspended—85 days to serve.

At the sentencing hearing, Buchanan asked the court to delay the commencement of his sentence for one day so that he could attend to personal affairs. Under AS 12.55.025(c), a sentencing judge has the power to delay the commencement date of a defendant's sentence, but District Court Judge Mark I. Wood was unwilling to release Buchanan without a suitable third-party custodian. He ordered Buchanan to begin serving the sentence immediately, but he told Buchanan's attorney that he would calendar a hearing on Buchanan's motion when a third-party custodian was found.

About two weeks later, Buchanan's attorney renewed the request for a one-day release from custody and, on November 28th, Judge Wood held a hearing on this matter. The State opposed Buchanan's release, arguing that it constituted an unauthorized furlough. But Judge Wood concluded that Criminal Rule 35(b) gave him the authority to modify Buchanan's sentence, turning it into a sentence of periodic imprisonment by interrupting it for one day. Judge Wood ordered Buchanan released to his proposed third-party custodian for three and a half hours on December 1st (from 1:30 p.m. until 5:00 p.m.). The judge ordered Buchanan not to drive or drink during this short release.

*The definitions of "furlough" and "periodic imprisonment"*

As explained above, the State argues that the district court illegally granted furloughs to the defendants, while the Public Defender Agency argues that the district court lawfully modified the defendants' sentences, converting them to sentences of periodic imprisonment. To analyze these competing contentions, we must first define the terms "furlough" and "periodic imprisonment".

Defining "furlough" is the easier task because the Alaska Statutes contain a definition of this term. AS 33.30.901(9) states that a furlough is "an authorized leave of absence from actual confinement for a designated purpose and period of time". (See also 22 AAC 05.660(c)(2), which defines "furlough" as an "authorized absence of a prisoner from a facility for a designated purpose and period of time".)

The Department of Corrections can grant furloughs for a broad range of purposes. Indeed, AS 33.30.101(a) authorizes the Commissioner of Corrections to "adopt regulations governing the granting of prerelease and short-duration furloughs ... for any ... rehabilitative purpose the commissioner determines to be in the interests of the prisoner and the public". Under this statute, furloughs can be granted to allow prisoners to:

(1) obtain counseling and treatment for alcohol or drug abuse;

(2) secure or attend vocational training;

(3) obtain medical or psychiatric treatment;

(4) secure or engage in employment;

(5) attend educational institutions;

(6) secure a residence or make other preparations for release; [or]

(7) appear before a group whose purpose is a better understanding of crime or corrections[.]

(The Commissioner has exercised this authority. See 22 AAC 05.316, which authorizes "prerelease or short-duration furlough[s] for [any] purpose listed in AS 33.30.101(a)".)

We encounter a more difficult time defining "periodic imprisonment" because the legislature has not enacted a definition of this term. AS 12.55.015, the statute which authorizes sentencing courts to impose periodic imprisonment, distinguishes between sentences of "continuous" imprisonment and sentences of "periodic" imprisonment.[2] But this only illustrates the normal definition of "periodic".

According to the dictionary, "periodic" can mean either "occurring ... or recurring at

---

2. *See* AS 12.55.015(a)(3)-(4). See also AS 12.55.086(a), which draws the same distinction.

regular intervals" or "occurring from time to time; intermittent".[3] Thus, a sentence of "periodic" imprisonment necessarily entails periods of non-imprisonment; periodic imprisonment is, by definition, not continuous.

The legislative commentary to AS 12.55.015(a)(3) gives only one example of the kind of periodic imprisonment that the legislature had in mind: a judgement allowing a defendant "[to] serv[e] a prison term on weekends".[4] From this example, and from the wording of AS 12.55.015(a)(3) itself (which speaks of a court's authority to impose a "definite term of periodic imprisonment"), one might infer that the legislature was thinking of terms of imprisonment that are divided into discrete blocks of time—each period of incarceration comprising a set or predictable number of days, separated by periods of freedom that are likewise of set or predictable length and that occur at set or predictable intervals.

Indeed, the only sentence of periodic imprisonment that this court has previously reviewed fit this model: the defendant was ordered to spend six months of each year in prison (from September 1st to March 1st), allowing the defendant to be free during the remaining six months of the year to pursue commercial fishing or other seasonal employment.[5]

The State takes this reasoning one step farther and suggests that, in order to distinguish a sentence of periodic imprisonment from a furlough, we should define "periodic imprisonment" to mean a sentence that entails at least three periods of incarceration and two intervening periods of release. But this inference is unwarranted. Assuming that the main criterion of periodic imprisonment is the predictability of the periods of incarceration and release, a court could satisfy this criterion by dividing the defendant's term of imprisonment into two portions (not necessarily equal portions) with one intervening period of freedom, so long as the two periods of incarceration and the interval of freedom were of set or predictable lengths (thus making the interval of freedom occur at a predictable time).

Aside from our rejection of the State's theory, we need not resolve the precise definition of "periodic imprisonment" to resolve the current litigation. As we explain in more detail in the remainder of this opinion, the actions of the district court in these three cases exceeded the court's lawful power to modify a previously imposed sentence, regardless of the exact definition of "periodic imprisonment".

*A sentencing court's power to modify a sentence after it is imposed*

As explained earlier, the Public Defender Agency argues that the district court was authorized to interrupt the three defendants' sentences because, under Criminal Rule 35(b), a court is empowered to modify a defendant's sentence within 180 days after distribution of the court's written judgement. The Agency contends that the district court exercised this power in these three appeals, modifying the defendants' sentences to sentences of periodic imprisonment.

To analyze this argument, we must briefly examine the history of Criminal Rule 35(b).

Before 1978 (when the legislature enacted a sweeping revision of the Alaska criminal statutes), a former version of Criminal Rule 35(a) governed a court's power to modify a sentence. Under that former rule, a court could reduce a sentence within 60 days after it was imposed, or within 60 days after the defendant exhausted any appellate remedies.[6] In mid–1978, the supreme court extended this time limit to 120 days.[7]

But this power of sentence modification did not authorize courts to supervise the placement and treatment decisions made by the

---

3. *Webster's New World Dictionary of American English* (Third College Edition, 1988), p. 1004.

4. 1978 Senate Journal, Supp. 47 (June 12th), p. 149.

5. *See Whittlesey v. State*, 626 P.2d 1066, 1067 (Alaska 1980).

6. The text of former Criminal Rule 35(a) is quoted in *Thomas v. State*, 592 P.2d 1248, 1249 n. 1 (Alaska 1979).

7. *See* Supreme Court Order No. 319 (effective August 16, 1978).

Department of Corrections. The Alaska Supreme Court clarified this issue in *Rust v. State*, 582 P.2d 134 (Alaska 1978), and in its opinion on rehearing, 584 P.2d 38 (Alaska 1978).

In its initial *Rust* decision, the supreme court declared that the executive branch of government has primary responsibility for decisions concerning a prisoner's placement and treatment[8], and thus a court has no power to designate a particular correctional or treatment facility as the place where the defendant will serve their sentence.[9] The supreme court acknowledged that a court could intervene if the executive branch demonstrated deliberate indifference to a prisoner's serious medical needs.[10] But in its opinion on rehearing, the supreme court clarified that such issues could not be raised in a motion for sentence modification under Criminal Rule 35(a):

> We [hold] that Criminal Rule 35(a) is not the appropriate procedural vehicle to seek relief as to conditions within custodial institutions or the civil rights of inmates. Thus, all future proceedings [regarding Rust's assertion that his treatment needs are not being met] are to be conducted as if Rust had instituted an independent civil action seeking treatment for his dyslexi[a].

*Rust*, 584 P.2d at 39.

Then, in 1978, the landscape changed when the Alaska Legislature enacted AS 12.55.088. AS 12.55.088(a) gave courts the power to "modify or reduce a sentence at any time during a [defendant's] term of imprisonment if ... conditions or circumstances [had] changed since the original sentencing hearing such that the purpose of the original sentence [was] not being fulfilled". According to the legislative commentary, this statute was designed to allow judges to intervene when prison officials failed to pursue a prisoner's treatment or rehabilitative needs:

> The thrust of this [statute] is to provide for correction of demonstrable inequities resulting from breakdowns in the process of classifying prisoners.

Presently, after a defendant is sentenced to imprisonment[,] he is classified by a committee within the Division of Corrections for placement, treatment, work[,] and educational releases. If the sentencing court determines that the defendant needs alcohol rehabilitation treatment and sentences the person with that in mind, the classification committee may inadvertently subvert that purpose by [its] decision for placement or manner of treatment. Current rules allow for a motion to modify sentence in such circumstances only for a limited period after the sentencing hearing. This [statute] would grant such jurisdiction to the court at any time during a term of imprisonment if it finds that the change in circumstances or conditions results in subverting the intent of the original sentence.

1978 Senate Journal, p. 1445.

In other words, AS 12.55.088 altered the rule established in *Rust* by giving courts the authority to entertain a motion to modify a defendant's sentence of imprisonment if the Department of Corrections failed to offer the treatment or pursue the rehabilitative efforts that the sentencing judge had in mind when the sentence was imposed. Two years later, the supreme court enacted a new subsection (b) to Criminal Rule 35, incorporating the provisions of AS 12.55.088 into the criminal rules.[11]

In 1982, the legislature attempted to cut back on the scope of AS 12.55.088 by amending the statute to specify that a defendant's motion to modify their sentence had to be filed within 60 days of the original sentencing (rather than "at any time during a term of imprisonment"). The legislative commentary to this amendment indicated that the legislature was attempting to rescind the policy it enacted in 1978—the policy of allowing courts to modify a sentence at any time during a defendant's term of imprisonment in response to classification decisions made by corrections officials:

---

**8.** *See Rust*, 582 P.2d at 137.

**9.** *See id.* at 137–38.

**10.** *See id.* at 140–43.

**11.** *See* Supreme Court Order No. 426 (effective August 1, 1980).

Given the fact that in felony cases there is frequently a delay between conviction and sentencing of between six weeks and six months, [a delay that is intended to allow] all pertinent factors to be collected and prepared for argument by both the defense and the prosecutor, and that a complete sentencing report prepared by the division of corrections must be considered by the superior court judge, a two[-]month period is sufficient to allow for a modification of the sentence.

*Commentary and Sectional Analysis for the 1982 Amendments to Alaska's Law on Criminal Law and Procedure and the Revised Criminal Code,* 1982 House Journal, Supp. No. 64 (June 2nd), p. 20.

The legislature's statement—that 60 days was long enough for the court to do a proper job, given the thorough process that generally precedes a criminal sentencing—indicates that the legislature wanted the courts to perform a much narrower job than had been assigned to the courts under the prior law. Sixty days might arguably be a reasonable amount of time to reconsider a sentencing decision, but it is obviously inadequate to allow the court to monitor and respond to Department of Corrections decisions regarding placement and treatment of the defendant. This leads us to conclude that the legislature no longer wanted the courts to perform that function.

The legislature passed the amended statute, but the law did not change. As explained above, the 1982 version of Criminal Rule 35(b) by this time contained language that paralleled AS 12.55.088; thus, the legislature needed to amend both the statute and Criminal Rule 35(b). To amend the court rules, the legislature must achieve a two-thirds' majority[12], and the 1982 amendment to AS 12.55.088 failed to attract this majority.

Thirteen years later, however, the legislature successfully amended the law relating to sentence modification. In SLA 1995, ch. 79, §§ 29–31, the legislature enacted a new version of Criminal Rule 35. Criminal Rule 35(a) was redrawn to limit its scope to the correction of illegal sentences[13], and the pertinent language of Criminal Rule 35(b)—subsection (b)(1)—was revised to read: "The court ... may modify or reduce a sentence within 180 days of the distribution of the written judgment upon a motion made in the original criminal case[.]"[14]

Although the legislature chose an expanded time limit of 180 days rather than the 60-day limit it had favored in 1982, it appears that the legislature's 1995 reworking of the statute was motivated by the same policy as the failed 1982 amendment: to deprive courts of the ongoing authority to monitor Department of Corrections treatment and placement decisions throughout a defendant's term of imprisonment. This is demonstrated not only by the 180-day time limit, but also by the legislature's concurrent enactment of two new provisions—Criminal Rule 35(b)(4) and (b)(5)—that remove or restrict a court's authority to modify or reduce a sentence imposed in accordance with a sentencing agreement.[15]

Criminal Rule 35(b)(4) prohibits a court from modifying a sentence that has been imposed pursuant to a sentencing agreement that placed a cap on the defendant's sentence, while Criminal Rule 35(b)(5) prohibits a court from reducing a sentence below the minimum sentence negotiated in a sentencing agreement. Since these restrictions apply regardless of whether the Department of Corrections' treatment and placement decisions comport with the sentencing court's wishes or recommendations, it follows that the legislature no longer wished the courts to monitor these decisions or respond to them.

One could argue, perhaps, that the legislature still wished to give courts a 180-day window to respond to Department of Corrections placement or treatment decisions in cases where the defendant's sentence is not the result of a sentencing agreement. But there appears to be no rationale for such a rule—no reason why the legislature would want the courts to have the power to react to

---

**12.** *See* Alaska Constitution, Art. IV, § 15.

**13.** *See* SLA 1995, ch. 79, § 29.

**14.** SLA 1995, ch. 79, § 30.

**15.** *See* SLA 1995, ch. 79, § 30.

Department of Corrections classification decisions in the one instance and not the other. We therefore conclude that the legislature has rescinded the authority it granted to the judiciary in 1978 when it enacted the initial version of AS 12.55.088.

This, of course, does not prevent prisoners from exercising the right recognized in the *Rust* opinion on rehearing—the right to sue the Department of Corrections if the Department fails to address a prisoner's serious medical needs. But with regard to motions for sentence modification under Criminal Rule 35(b), the legislature has apparently reinstated the rule announced by the supreme court in *Rust:* Rule 35(b) "is not the appropriate procedural vehicle" to seek relief from placement or treatment decisions of the Department of Corrections.[16]

*Even during the 180 days in which a court may modify a sentence, the court's decision to modify a sentence and impose periodic imprisonment must be based on the Chaney criteria—the sentencing criteria now codified in AS 12.55.005*

In *State v. Couch,* 991 P.2d 1286 (Alaska App.1999), this court acknowledged that Criminal Rule 35(b) was "designed to allow a sentencing judge to reconsider and potentially reduce a criminal sentence for a limited period of time", but we declared that Rule 35(b) was "not designed to allow a trial judge to grant a furlough to a prisoner" because "furloughs are within the authority of the Department of Corrections, not the courts".[17] The problem, of course, is to distinguish furloughs from the intervals of liberty that occur during a sentence of periodic imprisonment.

We have already rejected the State's suggestion that a sentence of periodic imprisonment must have at least two intervals of liberty and three intervals of imprisonment. Thus, a sentence of periodic imprisonment

might consist of two periods of imprisonment separated by one interval of freedom. What, then, distinguishes the interval of release in a sentence of periodic imprisonment from the interval of release that is granted under the name "furlough"?

The obvious answer is that furloughs are granted by officials of the Department of Corrections, while sentences of periodic imprisonment are granted by judges. Although this answer might seem to be of little help, it does in fact assist our analysis of the district court's actions in the present appeal—because a judge's duties are different from the duties of corrections officials.

■ Both the supreme court's decision in *Rust* and this court's decision in *Couch* are premised on the legal doctrine that, once a defendant has been sentenced and committed to the custody of the executive branch, the executive branch assumes primary responsibility for the custody and care of the prisoner. It is the executive branch that decides where the prisoner is to be housed, what treatment programs will be offered to the prisoner, and whether and when the prisoner will be released on a furlough of any type. *Rust* explicitly holds that judges are forbidden from using a motion for sentence modification under Criminal Rule 35 as a procedural vehicle for scrutinizing and second-guessing these executive branch decisions.

Criminal Rule 35(b) does not allow judges to reconsider executive branch decisions. Rather, Criminal Rule 35(b) authorizes judges to reconsider judicial branch decisions—*i.e.*, their own prior sentencing decisions. Thus, when a judge grants a sentence modification or reduction under Criminal Rule 35(b), the judge's decision must be based on the sentencing criteria first announced in *State v. Chaney*[18] and now codified in AS 12.55.005.[19]

---

**16.** *Rust,* 584 P.2d at 39.

**17.** *Couch,* 991 P.2d at 1289.

**18.** 477 P.2d 441, 443–44 (Alaska 1970).

**19.** AS 12.55.005 states:

The purpose of this chapter is to provide the means for determining the appropriate sentence

to be imposed upon conviction of an offense. The legislature finds that the elimination of unjustified disparity in sentences and the attainment of reasonable uniformity in sentences can best be achieved through a sentencing framework fixed by statute as provided in this chapter. In imposing sentence, the court shall consider

■ When a judge modifies a defendant's sentence under Criminal Rule 35(b), changing the sentence to a term of periodic imprisonment and thereby granting the defendant an interval of release from custody, the judge's action will be proper if the judge's order is premised on, and structured to serve, the codified sentencing goals. If, however, the judge is simply responding to a defendant's *ad hoc* needs, or if the judge assumes the role of arbiter in a dispute between the defendant and the Department of Corrections regarding custody, placement, or treatment, then the judge's action infringes on executive branch prerogatives and the defendant's interval of release will constitute an unauthorized furlough.

As this court recognized in *State v. Tinsley*, 928 P.2d 1220 (Alaska App.1996), Criminal Rule 35(b) "allows a sentencing judge [180 days] to reconsider and potentially reduce [or modify] a criminal sentence. This authority can be exercised even when there is no reason to reduce [or modify] the sentence other than the judge's decision to reconsider and show mercy."[20] Nevertheless, a court must not intrude on the authority of the Department of Corrections, an agency of a co-equal branch of government. That is, a court is empowered to modify a sentence based on the *Chaney* criteria, but not to simply interrupt the sentence to address a prisoner's short-term needs.

This interpretation is supported by the legislative history of Criminal Rule 35(b), which we detailed in the previous section of this opinion. This history indicates that Criminal Rule 35(b) was intended only to give courts a reasonable opportunity to revisit the original sentencing decision, rather than to allow courts to address a prisoner's changing needs. This history further indicates that the legislature did not intend for courts to use Criminal Rule 35(b) to grant *ad hoc* releases to prisoners so they can attend to personal business or personal needs, even when a short release could arguably serve some rehabilitative purpose.

These conclusions are also supported by the language of the rule itself. Although the current version of Criminal Rule 35(b) gives courts 180 days to modify a sentence, the fact that the court must act within 180 days suggests that the legislature did not design Criminal Rule 35(b) to allow courts to accommodate a prisoner's short-term personal needs. It is true, as the Public Defender Agency points out in its brief, that prisoners will sometimes have to deal with sick children, unreliable or disappearing day care, lost loan payments, distraught family members, and other crises of daily life. The Public Defender Agency suggests that these crises can constitute a proper rationale for judicial intervention, "to insure that the defendant's sentence [is] equitable and not an excessive imposition or punishment". But such emergencies are not confined to the initial six months following the distribution of the judgement. It seems unlikely that the legislature intended Criminal Rule 35(b) to empower courts to act as an ombudsman for the first six months of a defendant's sentence, then leave defendants without recourse for these same problems during the remainder of their sentence.

Thus, both the history and the language of Criminal Rule 35(b) lead us to conclude that the rule was not designed to allow courts to interrupt a sentence by granting a leave of absence for the convenience of the prisoner. Rather, the rule was designed to give sentencing judges one opportunity, within a six-month window, to "reconsider and potentially

---

(1) the seriousness of the defendant's present offense in relation to other offenses;

(2) the prior criminal history of the defendant and the likelihood of rehabilitation;

(3) the need to confine the defendant to prevent further harm to the public;

(4) the circumstances of the offense and the extent to which the offense harmed the victim or endangered the public safety or order;

(5) the effect of the sentence to be imposed in deterring the defendant or other members of society from future criminal conduct;

(6) the effect of the sentence to be imposed as a community condemnation of the criminal act and as a reaffirmation of societal norms; and

(7) the restoration of the victim and the community.

**20.** *Tinsley*, 928 P.2d at 1223 (citing *Thomas v. State*, 566 P.2d 630, 639 n. 34 (Alaska 1977)) (both cases construing the predecessor rule, a prior version of Criminal Rule 35(a)).

reduce a criminal sentence" based on a re-evaluation of the *Chaney* criteria.[21]

This is not to say that courts have no authority to modify a defendant's sentence to a term of periodic imprisonment; this action is expressly authorized by Criminal Rule 35(b) and AS 12.55.015(a)(3). But a sentence reduction or modification under Criminal Rule 35(b) is, in effect, a second sentencing. Just as the court was obliged to base the defendant's original sentence on the sentencing criteria codified in AS 12.55.005, so too the court must base any modification or reduction on these same criteria.

Moreover, the legislature has expressed its intention that courts should resort sparingly to sentences of periodic imprisonment.[22] This directive is further support for the conclusion that the legislature intended any sentence of periodic imprisonment to be premised on an overall evaluation of the defendant's history, conduct, and circumstances in light of the sentencing goals codified in AS 12.55.005. Periodic imprisonment should be integral to the defendant's sentence. Such a sentence should be employed as a method for achieving defined sentencing goals—not as a method for granting defendants a weekend pass.

A contrary reading of Criminal Rule 35(b)—one that permitted courts to grant *ad hoc* leaves of absence in the name of "periodic imprisonment"—would frustrate the separation of powers recognized by the supreme court in *Rust.* The legislature has vested the Department of Corrections with authority over the day-to-day management of prisoners—the selection of the facility where they will be housed, the selection of treatment programs offered to them, and the decision of whether and when to grant them furloughs. With respect to furloughs, the legislature and the Department of Corrections have enacted statutes and regulations that comprehensively govern furloughs based on (1) a prisoner's rehabilitative, treatment, and personal needs, (2) the prisoner's level of dangerousness, and (3) the ability of the Department to adequately supervise the prisoner's release.[23] Allowing dozens of judges to intervene intermittently and unpredictably in this process would make it difficult for the Department of Corrections to carry out its mandate fairly and consistently, and this type of judicial intervention might inadvertently expose the public to unacceptable risk.

*Our analysis of the district court's actions in the three cases before us*

Now that we have clarified the power of a court to reduce or modify a sentence under Criminal Rule 35(b), we turn to the three cases before us.

*The Felix appeal.*

■ Magistrate Hammers granted Jolene Felix two short releases from jail: on November 30, 2000, so that she could attend a screening interview required for her enrollment in the Tanana Chiefs' Old Minto Recovery Camp, and again on December 21, 2000, so that she could obtain a physical examination required for that same program. On both occasions, Felix's attorney urged Magistrate Hammers to portray his orders as a modification of Felix's sentence to a term of "periodic imprisonment". But the magistrate declined to ground his orders on Criminal Rule 35(b). Instead, he declared that he was issuing these orders "in the interest of fairness".

■ We hold that the magistrate exceeded his authority in both instances. A judge may not rely on general principles of fairness to grant a prisoner a short release from custody after they have commenced serving their sentence. Nor can we accept the Public Defender Agency's argument that the magis-

---

21. *Couch,* 991 P.2d at 1289.

22. *See* the Commentary to AS 12.55.015, 1978 Senate Journal, Supp. No. 47 (June 12th), p. 149: [AS 12.55.015(a)(3)] recognizes [the] judicial power [to impose] periodic imprisonment ..., such as serving a prison term on weekends. While periodic sentences may pose administrative problems for correctional institu-

tions and should be imposed sparingly, there are occasions which warrant such a sentence.

23. *See* AS 33.30.101—181 and 22 AAC 05.310—326; *see also* 22 AAC 05.121(j)(12) (clarifying that a prisoner released on furlough is still within the custody of the Department of Corrections and subject to the department's supervision).

trate's actions should be upheld as an implicit modification of Felix's sentence to one of periodic imprisonment under Criminal Rule 35(b). First, the magistrate entertained two separate applications from Felix for similar relief (temporary release from prison so that she could attend appointments that were prerequisites to her entry into the Old Minto Recovery Camp). Rule 35(b)(2) apparently bars the magistrate from doing that. But more importantly, both of Felix's releases were clearly *ad hoc* releases expressly designed to allow Felix to pursue her own desired treatment program in preference to the programs that the Department of Corrections might offer her in jail or might allow her to attend on furlough.

■ Magistrate Hammers ordered Felix released from jail for a third and final time on December 27th. He directed her to travel directly to the Old Minto Recovery Camp and remain there until she successfully completed the treatment program. The magistrate declared that this final release was justified because, as the sentencing judge, he had the authority to require that the balance of Felix's term of imprisonment be spent at the Old Minto Recovery Camp. This was not true. The Alaska Supreme Court expressly held in *Rust v. State* that a court does *not* have the power to direct that a defendant's sentence be spent at any particular facility.

■ We should point out, however, that there was an available sentencing alternative that would have allowed Magistrate Hammers to accomplish something similar to what he was trying to do when he ordered Felix's final release from custody on December 27th. Assuming that the Tanana Chiefs had been willing to interview and examine Felix at the jail (and that they then accepted Felix into their program), Magistrate Hammer would have been authorized under Criminal Rule 35(b) to modify Felix's sentence to allow her take advantage of the Old Minto Recovery Camp—not by imposing "periodic imprisonment", but rather by suspending the balance of her sentence and requiring, as a condition of probation, that she attend and successfully complete the Old Minto program. Assuming that Felix successfully completed the program and complied with any other conditions of probation, she would not have to serve the remainder of her sentence.

### The Fain appeal.

■ Judge Burbank released Pamela Fain for four days in the middle of her sentence so that she could arrange child care for her son. This was an improper use of Criminal Rule 35(b), for the reasons we have explained above.

### The Buchanan appeal.

■ Judge Wood released Buchanan for 3½ hours in the middle of his sentence so that he could attend to personal business. Again, this was an improper use of Criminal Rule 35(b).

Judge Wood stated that he felt obliged to honor Buchanan's request because he had promised Buchanan a short period of bail release to give Buchanan some time to put his affairs in order before he commenced serving his sentence. This promise never came to fruition because Buchanan could not produce a suitable third-party custodian. But once Buchanan commenced service of his sentence, Judge Wood lost the authority he had earlier possessed to allow Buchanan a few hours of conditional liberty on bail release.

### Conclusion

For the reasons explained here, the sentence modifications ordered by the district court in these three cases are REVERSED.

COATS, Chief Judge, dissenting.

COATS, Chief Judge, dissenting.

I write separately because I am concerned that this court's decision will be interpreted too narrowly and unduly restrict a trial court's authority to do justice in individual cases.

We can say some key things with relative certainty in this area of the law. Under Criminal Rule 35(b), courts have 180 days from the time of sentencing to modify a sentence. Courts also have the authority, under AS 12.55.015(a)(3), to impose a "peri-

odic sentence." The statute does not define "periodic imprisonment," but, as an example, the commentary to the Alaska revised criminal code provides, "serving a prison term on weekends."[1] The commentary recognizes that some circumstances warrant periodic sentences but urges sentencing courts to impose them sparingly because of the administrative burdens they create for correctional institutions.[2] The tentative draft to the revised criminal code expressly provided that a court should impose a periodic sentence only if doing so would serve the purposes of sentencing (set out elsewhere in the statute).[3] The draft commentary gives this example of a circumstance justifying a periodic sentence: "the impact that serving a continuous 10–day mandatory sentence for [DWI] could have on a young person in the senior year of high school might well be disproportionate if the offender was required to repeat the entire school year as a result of missing too many school days or exams."[4]

From this body of law, it is fair to conclude that the legislature did intend for courts to use their power to impose periodic sentences sparingly to avoid putting an undue burden on the Department of Corrections, which has primary responsibility for sentenced prisoners. The Department of Corrections has its own furlough program that may very well adequately address most of prisoners' needs. But this court has little information about how the Department of Corrections manages its furlough program. And, as long as judges use their power to modify sentences and to impose periodic sentences sparingly, I believe that this power is a valuable tool in allowing courts to impose just sentences. I would therefore allow courts wide flexibility. Consequently, I would define a periodic sentence merely as a sentence that is interrupted in some way.

The example of a periodic sentence in the tentative draft of the revised criminal code provides a good example. A young woman in her senior year of high school is convicted of driving while intoxicated and faces a mandatory term of imprisonment. The judge should be able to sentence her to jail while structuring her sentence so she is able to take her final exams.

As a practical matter, the flexibility to impose periodic sentences allows courts to sentence offenders to jail while still meeting an offender's critical needs. Without this flexibility, a court might have to choose between imposing a shorter sentence that does not adequately reflect the defendant's conduct and a longer sentence that would cause disproportionate harm by, for example, preventing a high school senior from taking final exams. Another example is a commercial fisher who must support a family during a short fishing season. Certainly a court should have the authority to sentence the offender to a sentence of imprisonment but to fashion the sentence so that the offender is released to fish during the short season.

Now I am fairly certain that my colleagues would agree that a court has the authority to impose a sentence that would enable the high school senior to take her exams or the commercial fisher to pursue his livelihood. But I am concerned that the court's opinion will be read too narrowly to unduly erode the flexibility of courts to sentence.

For instance, in the case of Pamela Fain, the record is inadequate for us to review the trial court's decision. Fain asked for release so that she could arrange for child care for her son and make a doctor's appointment for him. For all we know, these matters were true emergencies and Fain had no alternative but to attend to these matters herself for the welfare of her child. We do not know if the Department of Corrections could have responded to these needs. If a temporary

1. *See Commentary on the Alaska Revised Criminal Code,* Senate Journal Supp. No. 47 at 149 (June 12, 1978); *see also State v. Brinkley,* 681 P.2d 351, 355 (Alaska App.1984) (describing sentence served on three-day weekends every other weekend for two years as a "periodic sentence").

2. *See Commentary to the Revised Criminal Code,* Senate Journal Supp. No. 47 at 149.

3. *See Alaska Revised Criminal Code,* Part VI at 61 (Tentative Draft, February 1978).

4. *Alaska Revised Criminal Code,* Part VI at 68 (Tentative Draft Commentary, February 1978).

release to take care of emergency matters was not available, the court had the authority to modify Fain's sentence to provide for her immediate release. To me, it seems wiser to allow the court the flexibility to temporarily release Fain to deal with an emergency. I could make similar arguments for the other releases this court is reviewing. The point is that I want courts to have a great deal of flexibility to respond to emergency or difficult situations. And I do not believe the law prevents this.

That having been said, I agree with the majority that the power to impose periodic sentences is one that the legislature has told courts to use sparingly. Furthermore, I agree that the primary authority and responsibility for sentenced prisoners lies with the Department of Corrections and courts should fully consider the Department's primary authority and the administrative burden that the court's sentencing orders might impose.

The problem with the cases we have been asked to review is that the record does not show that the courts in question were using their power to impose periodic sentences sparingly and that they were considering the impact of the orders on the Department of Corrections. In my view, if these cases were not moot, I would remand the cases back to the trial court for reconsideration. My concern is that, by simply saying that the court orders in these cases were not authorized, this court could be interpreted as unduly restricting the authority of courts to impose or modify sentences in unusual situations where justice calls for courts to show flexibility in sentencing.