Wenona DIAZ, Appellant,

v.

STATE of Alaska, DEPARTMENT OF CORRECTIONS; Jennifer Christensen; James Bowers; McHenry Detective Agency; William Parlier; Probation Officer Brown; Probation Officer III McCarron; and Probation Officer L. Williamson, Appellees.

No. S–13151.

Supreme Court of Alaska.

Oct. 1, 2010.

Kenneth W. Legacki, Anchorage, for Appellant.

Ruth Botstein, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellees Officers Conrad Brown, Terry McCarron, and Loyd Williamson.

Timothy M. Lynch, Lynch & Associates, P.C., Anchorage, for Appellees McHenry Detective Agency and William Parlier.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

## OPINION

WINFREE, Justice.

## I. INTRODUCTION

While serving a sentence in the Alaska Department of Corrections's (DOC) electronic monitoring program, Wenona Diaz worked for a time at a travel agency. Shortly after Diaz stopped working at the travel agency, DOC probation officers brought Diaz to her former employer's office. There the former

employer and the former employer's private detective questioned Diaz about alleged criminal conduct. The DOC officers then returned Diaz to a correctional center for the remaining four weeks of her sentence, where she was briefly segregated from the general population and had her telephone privileges restricted for a few days.

After Diaz's former employer was convicted of defrauding her own customers and the accusations against Diaz were abandoned, Diaz sued those involved in her interrogation and return to jail. The superior court granted summary judgment in favor of the DOC officers and the private detective and his agency. Diaz appeals only the superior court's ruling that these defendants did not violate her rights under the Fourth or Fourteenth Amendments to the United States Constitution.

We affirm the superior court's decision because: (1) Diaz's officer-escorted trip to and interrogation at the travel agency did not implicate her Fourth Amendment rights as she was already in DOC custody when the DOC officers "seized" her; (2) the DOC officers' actions, although disturbing, did not "shock the conscience" as required for a violation of the Fourteenth Amendment; (3) Diaz's return to prison, her day of segregation from the general population, and the two days of telephone restrictions did not deprive her of a liberty interest in violation of the Fourteenth Amendment because her freedom was not restrained in excess of her sentence and she did not experience an atypical or significant hardship in comparison to ordinary prison life; and (4) the private detective and his agency are not liable for conspiring with state officials to violate Diaz's constitutional rights because no such violation occurred.

## II.  FACTS AND PROCEEDINGS

### A.  Facts[1]

In late May 2003 Diaz had about one month of a felony sentence left to serve in DOC's electronic monitoring program. On May 21 private detective William Parlier called DOC to report that his client Jennifer Christensen had that day fired Diaz as an employee of her travel agency. Parlier reported that when Diaz was hired she had not told Christensen she was on felony supervision and that Diaz had since been taking files home, diverting clients' emails to outside accounts, charging items to clients' credit cards, and interrogating other employees for "dirt." The DOC officer who took Parlier's call provided the telephone number of the electronic monitoring department, which was supervised at that time by DOC Officer Terry McCarron.

On May 22 Christensen called Officer McCarron and alleged that Diaz stole from her while employed at her travel agency. Officer McCarron later testified at his deposition that Christensen's allegation on its own was sufficient to transfer Diaz from the electronic monitoring program to jail. Parlier went to Officer McCarron's office to coordinate an opportunity to ask Diaz questions, and Parlier there met DOC Officers Loyd Williamson and Conrad Brown. Officer McCarron directed the two DOC officers to investigate.

Officers Williamson and Brown contacted Diaz by telephone at her new place of employment and requested she meet them at her house as soon as possible, but did not explain why. Diaz complied by leaving work and taking a cab home. The DOC officers met her in her driveway and walked inside with her, where they informed her she had to go to Christensen's travel agency because there was a "concern about missing files." The DOC officers escorted Diaz to their van and put her in the caged-in back seat.

Officers Williamson and Brown took Diaz to the travel agency and escorted her inside. She waited in an office, guarded by one of the DOC officers, for somewhere between one and one-and-one-half hours. The DOC officer was between her and the door at all times, such that Diaz inferred she "was not to leave the room or be away from him."

1.  We accept the facts as alleged by Diaz and make all reasonable inferences in her favor because this case was resolved against her on summary judgment. *See Trombley v. Starr–Wood Cardiac Group, PC,* 3 P.3d 916, 918 n. 1 (Alaska 2000).

Diaz then was taken into another office in which Parlier's videocamera and several chairs were arranged. At some point that morning, Parlier, Christensen, and Officers Williamson and Brown had consulted and decided to videotape the questioning. Present in the office with Diaz were Christensen; her husband, James Bowers; Parlier; and Officers Williamson and Brown. Parlier directed the interrogation and asked prepared questions regarding embezzlement and theft of money and documents. Christensen and Bowers also asked Diaz questions in accusatory tones. Parlier videotaped the interrogation, but later lost the videotape. During the approximately 30–minute interrogation, Diaz denied all of the allegations against her and accused Christensen of being responsible for the embezzlement.

After the interrogation at the travel agency, Officers Williamson and Brown escorted Diaz back to her house. They searched her house and computer, but found no incriminating evidence.[2] Immediately following the search, the DOC officers took Diaz to the Anchorage jail. Within an hour of Diaz's transfer to jail, Christensen called Officer McCarron and alleged that Diaz was calling Christensen's clients from jail. Diaz's telephone access was then restricted so she could call only her lawyer. At the same time Diaz's cellmate was removed, and Diaz was segregated from the rest of the jail popula-

tion. Prison records show Diaz was placed in segregation on May 22 at 5:00 p.m. and removed from segregation the following morning at 9:35 a.m.—almost 17 hours. Diaz remained at the Anchorage jail for two days before being transported to Hiland Mountain Correctional Facility, where she was able to place calls to her family. Diaz served the time remaining on her sentence, about three weeks, in an institutional prison.

Christensen was indicted in April 2004 for defrauding her travel agency's clients and a credit card processing company of nearly $250,000, and later pled guilty to 20 counts of wire fraud and one count of credit card fraud.

### B. Proceedings

In May 2005 Diaz filed suit against DOC, Christensen, Bowers, Parlier and his detective agency, and DOC Officers McCarron, Williamson, and Brown, asserting 42 U.S.C. § 1983 claims under the United States Constitution, among other claims.[3] Summary judgment was granted in November 2006 as to *Bivens* claims against Parlier and his agency under the United States and Alaska Constitutions[4] and § 1983 claims against Parlier's agency premised on respondeat superior.[5] At the same time, the § 1983 claim against DOC was dismissed, and Diaz

---

2. As a participant in DOC's electronic monitoring program, Diaz had consented to searches of her residence for the presence of contraband or to verify compliance with the program's terms and conditions.

3. 42 U.S.C. § 1983 allows for a direct action against persons who have violated federal constitutional or statutory rights while acting under color of law. *State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. v. Native Vill. of Curyung,* 151 P.3d 388, 392 (Alaska 2006) (citing *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)).

4. A *"Bivens* claim," named for *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), is a direct cause of action for compensatory damages against an individual federal official who violates federal constitutional rights. *Id.* (concerning action for violation of Fourth Amendment); *Bush v. Lucas,* 462 U.S. 367, 376–78, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (discussing *Bivens* actions for violation of

the First Amendment, the Due Process Clause of the Fifth Amendment, and the Eighth Amendment). The superior court determined that a federal *Bivens* claim cannot be brought without the involvement of a federal officer, and that a state *Bivens* claim will not be recognized when alternative statutory or common law remedies exist. We have stated "we will not [allow] a private cause of action for damages under the Alaska Constitution 'except in cases of flagrant constitutional violations where little or no alternative remedies are available.'" *Hertz v. Beach,* 211 P.3d 668, 677 n. 12 (Alaska 2009) (quoting *Lowell v. Hayes,* 117 P.3d 745, 753 (Alaska 2005)). Diaz does not pursue an appeal of this ruling.

5. The superior court concluded the respondeat superior doctrine does not apply in § 1983 cases, citing to *Prentzel v. State, Dep't of Pub. Safety,* 53 P.3d 587, 595 n. 46 (Alaska 2002). Diaz does not pursue an appeal of this ruling.

conceded she was not suing the DOC officers in their official capacities.[6] The superior court later granted summary judgment as to the remaining § 1983 claims against the DOC officers in their individual capacities and against Parlier and his detective agency for lack of constitutional violation upon which to base conspiracy. Final judgment dismissing all claims against DOC, the DOC officers, and Parlier and his detective agency was entered in May 2008.[7]

Diaz appeals the dismissal of her § 1983 claims against the DOC officers in their individual capacities and her § 1983 claims against Parlier and his detective agency, premised on conspiracy, all based on alleged violations of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## III. STANDARD OF REVIEW

■ We review the grant of summary judgment de novo.[8] "Drawing all reasonable inferences in favor of the nonmoving party, we will uphold summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."[9] We apply de novo review and our independent judgment to constructions of the United States Constitution.[10]

## IV. DISCUSSION

An essential element to a § 1983 action is "conduct [that] deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."[11] Diaz argues that the DOC officers and Parlier and his detective agency violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### A. The Officer–Escorted Trip To And Interrogation At The Travel Agency Did Not Violate Diaz's Federal Constitutional Rights.

■ Diaz asserts that her Fourth and Fourteenth Amendment rights were violated when the DOC officers, without giving her appropriate *Miranda* warnings,[12] escorted her to and held her at her former place of employment for a custodial interrogation conducted by private citizens.

■ The Fourth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees against unreasonable searches and seizures.[13] But the constitutionality of Diaz's officer-escorted trip to and interrogation at the travel agency is evaluated under the Fourth Amendment's protection against unreasonable seizures only if Diaz was not already in DOC custody.[14] If Diaz was al-

6. See *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). Diaz does not pursue an appeal of this ruling.

7. The final judgment did not address Diaz's claims against Christensen and Bowers except to note that defamation claims were dismissed by stipulation.

8. *Sowinski v. Walker*, 198 P.3d 1134, 1143 (Alaska 2008).

9. *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 303 (Alaska 2000) (citing *Shade v. CO & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995)).

10. *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 65 (Alaska 2001) (citing *Waiste v. State*, 10 P.3d 1141, 1144 (Alaska 2000)).

11. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327,

330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The other essential element is that "the conduct complained of was committed by a person acting under color of state law." *Id.* at 535, 101 S.Ct. 1908.

12. Under *Miranda v. Arizona*, law enforcement officers are required prior to interrogating a suspect in custody to give a warning about the right to remain silent, the right to the presence of a retained or appointed attorney, and the possibility that any statements made may be used as evidence. 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *accord State v. Salit*, 613 P.2d 245, 257 (Alaska 1980).

13. U.S. Const. amend. IV; *Lemon v. State*, 514 P.2d 1151, 1157 n. 13 (Alaska 1973) (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

14. See generally *U.S. v. Childs*, 277 F.3d 947, 950 (7th Cir.2002) ("[A]n officer may interrogate a person in prison on one offense about the possibility that the inmate committed another. This is

ready in DOC custody when the DOC officers escorted her to the travel agency, the incident is instead evaluated under either the Fourteenth Amendment's substantive due process guarantee [15] or the Eighth Amendment's protection against cruel and unusual punishment.[16] Diaz never asserted a violation of her Eighth Amendment rights.

### 1. Fourth Amendment analysis

■ Under Alaska law a prisoner must be in DOC custody to earn good time credit— the statutory one-third reduction of a prisoner's term of imprisonment earned by "follow[ing] the rules of the correctional facility in which the prisoner is confined." [17] A correctional facility is defined as "a prison, jail, camp, farm, half-way house, group home, or other placement designated by the commissioner for the custody, care, and discipline of prisoners." [18] Diaz was designated to serve her sentence at home in the electronic monitoring program, and she received good time credit for the time she spent in the program.[19] Diaz therefore was in DOC custody while serving her sentence in the electronic monitoring program.[20]

Diaz also was in DOC custody in the sense that she could have been prosecuted for escape had she removed the monitoring device

---

normal and, as far as we can tell, of unquestioned propriety as far as the fourth amendment is concerned, whether or not the officer has probable cause to believe that the inmate committed any other crime .... [t]he idea that the police could violate a prisoner's [*F*]*ourth* amendment rights by asking questions in search of information about other offenses has no basis in the language of that amendment or the Supreme Court's cases."); *Johnson v. City of Cincinnati*, 310 F.3d 484, 491 (6th Cir.2002) (remarking that "[t]he Fourth Amendment does not apply post-conviction" and that, whatever the duration of the Amendment's protections, the relevant analytical period exists "along the pretrial continuum" after which eventually "the Fourth Amendment's protection gives way to the protection of another Amendment"); *Riley v. Dorton*, 115 F.3d 1159, 1163–64 (4th Cir.1997) (holding that analysis of seizures under the Fourth Amendment applies only to an initial seizure, and subsequent conditions of detention are properly examined under the Fourteenth Amendment), *abrogated by Wilkins v. Gaddy*, — U.S. —, 130 S.Ct. 1175, 1177, — L.Ed.2d — (2010) (overruling *Riley* on Eighth Amendment grounds); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir.1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners."); *Wilkins v. May*, 872 F.2d 190, 192–93 (7th Cir.1989) (noting that, upon conviction, the "the fact, manner, or duration of" a prisoner's "continued confinement is unconstitutional passes over from Fourth Amendment to ... the Eighth Amendment"); *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988) (holding that, against Fourth Amendment challenge, a "judgment convicting [a criminal] extinguish[es], for the duration of his sentence, his interest in privacy and personal mobility ... the applicable provision is the Cruel and Unusual Punishments Clause of the [E]ighth [A]mendment"); *Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir.1985) (dismissing a prisoner's objection to

transfer within a prison system as against the Fourth Amendment as having "no basis in law").

**15.** *See Chavez v. Martinez*, 538 U.S. 760, 779–80, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (remanding for a determination whether officer's misconduct in pursuit of a confession was so egregious that it violated the Fourteenth Amendment's substantive due process guarantee); *see also id.* at 773, 123 S.Ct. 1994 (Thomas, J., plurality) (noting that police torture or other abuse resulting in a confession is evaluated under the Fourteenth Amendment's Due Process Clause).

**16.** The Eighth Amendment, through the Due Process Clause of the Fourteenth Amendment, forbids state prison officials from imposing "cruel and unusual punishments." U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he less protective Eighth Amendment standard applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'" *Graham*, 490 U.S. at 398–99, 109 S.Ct. 1865 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)).

**17.** AS 33.20.010(a); *State v. Bourdon*, 193 P.3d 1209, 1210 (Alaska App.2008).

**18.** AS 33.30.901(4); *Bourdon*, 193 P.3d at 1210.

**19.** Diaz's March 11, 2003, sentencing preceded the effective date of ch. 24, § 31, SLA 2007 (codified at AS 33.20.010(c)), which provides that prisoners cannot receive good time credit for time spent under electronic monitoring.

**20.** *See Matthew v. State*, 152 P.3d 469, 473 (Alaska App.2007) (citing AS 33.30.065) (referring to sentenced prisoners assigned to serve part of their terms of imprisonment in electronic monitoring as "already in the custody of the Department of Corrections").

or traveled outside permitted locations.[21] In holding that a sentenced prisoner had committed escape when he removed his electronic monitoring device and visited a tavern outside the area permitted by the conditions of his release, an Ohio appellate court stated that electronically monitored house arrest "constitutes confinement in a facility for *custody* of persons convicted of a crime."[22] In *Lock v. State* we similarly reasoned that the fact that a probationer had committed escape when he left a court-ordered residential rehabilitation program indicated that he had been "subjected to severe restraints on his freedom of movement" and therefore was in custody for purposes of entitlement to day-for-day credit.[23]

Because Diaz earned good time credit and was subject to prosecution for escape while in the electronic monitoring program, she was already in DOC custody when she was "seized" by the DOC officers. Therefore her officer-escorted trip to and interrogation at the travel agency cannot have violated her Fourth Amendment guarantee against unreasonable seizures.[24]

### 2. Fourteenth Amendment analysis

▮▮▮▮ Diaz asserts she was "subjected to interrogation without any due process, and without any advisement of her constitutional rights." She clarifies her argument is not that she was forced to testify against herself in violation of the Fifth Amendment,[25] but rather that she was unlawfully seized and interrogated in violation of the Fourteenth Amendment. Fourteenth Amendment substantive due process rights are violated when police misconduct in pursuit of incriminating statements "shocks the conscience."[26]

▮▮▮▮ Conscience-shocking interrogations typically involve physical or psychological abuse.[27] An illustration of potentially conscience-shocking interrogation conduct occurred in *Chavez v. Martinez*,[28] where a police officer "made no effort to dispel [a man's] perception that medical treatment [for his facial gunshot wound would be] withheld until [he] answered the questions put to him."[29]

Taking the evidence in the light most favorable to Diaz, the DOC officers subjected her to a custodial interrogation by civilians at her former place of employment without giv-

**21.** AS 11.56.310(a)(3) (providing that a person serving a felony sentence in an electronic monitoring program commits the crime of escape in the second degree if, without lawful authority, that person "removes, tampers with, or disables the electronic monitoring equipment" or leaves the places designated for service of that sentence).

**22.** *State v. Long*, 82 Ohio App.3d 168, 611 N.E.2d 504, 505–06 (1992) (emphasis added).

**23.** 609 P.2d 539, 545–47 (Alaska 1980).

**24.** We express no opinion whether we would reach the same conclusion had Diaz been sentenced after the effective date of AS 33.20.010(c). *See* note 19, above. Our conclusion does not suggest that a prisoner in Diaz's situation would not have Fourth Amendment protection against seizures by law enforcement officers other than DOC officers.

**25.** During the interrogation Diaz did not give any statement that was used against her in any proceeding.

**26.** *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 431 (9th Cir.2010) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)); *accord Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1130 (Alaska 1999) ("A [substan-

tive] due process claim will only stand if the state's actions 'are so irrational or arbitrary, or so lacking in fairness, as to shock the universal sense of justice.'") (quoting *Application of Obermeyer*, 717 P.2d 382, 386–87 (Alaska 1986)).

**27.** *See Crowe*, 608 F.3d at 431–32; *see also McConkie v. Nichols*, 446 F.3d 258, 261 (1st Cir.2006) ("Conscience-shocking conduct usually entails physical or psychological abuse, or significant interference with a protected relationship, such as the parent-child relationship."); *Cooper v. Dupnik*, 963 F.2d 1220, 1223, 1248–50 (9th Cir.1992) (noting "brutality by police or prison guards is one paradigmatic example of a substantive due process violation, [but] does not exhaust the possibilities" and holding it was conscience-shocking when police tried to extract a confession through "sophisticated psychological torture" with the "purpose of making it difficult, if not impossible, for [a charged] suspect to take the stand in his own defense" and of "curtailing [his] right to present an insanity defense"), *overruled on other grounds by Chavez*, 538 U.S. at 773, 123 S.Ct. 1994 (Thomas, J., plurality).

**28.** 538 U.S. at 779–80, 123 S.Ct. 1994.

**29.** *Id.* at 798, 123 S.Ct. 1994 (Kennedy, J., concurring in part and dissenting in part).

ing her an appropriate *Miranda* warning. But Diaz has not alleged or provided evidence suggesting she was mentally or physically coerced or abused during the interrogation. Although we certainly do not condone the DOC officers' decision to make Diaz available for interrogation in this manner by her civilian accusers—in other circumstances such a decision could lead to unfortunate acts of vigilantism—the DOC officers' conduct bothers the conscience but does not shock it as required for a Fourteenth Amendment violation.

**B. The Transfer To Prison, Day Of Segregation From The General Population, And Two Days Of Telephone Restrictions Did Not Violate Diaz's Federal Constitutional Rights.**

▮ Diaz asserts that she was deprived of a liberty interest without due process when "she was remanded to the institutional jail, put in solitary confinement," and "denied access to a telephone to call her family." [30]

▮ The Fourteenth Amendment protects against the deprivation of "life, liberty, or property" without adequate process of law.[31] It applies to "the deprivation of an individual interest of sufficient importance to warrant constitutional protection." [32] The point at which restraints on a convicted prisoner's freedom implicate a federal-constitution-based liberty interest requiring due process of law is when her freedom is restrained in excess of her sentence in an unexpected manner.[33] For example, due process requirements apply to parole revocations if a parolee returned to prison does not receive credit against her sentence for time spent subject to the conditions of parole.[34] In contrast, the time Diaz spent in the DOC's electronic monitoring program counted against her sentence. Therefore her transfer to the Anchorage jail, her segregation from the general population, and her telephone restrictions did not implicate a liberty interest based in the Fourteenth Amendment because they did not prolong her sentence.[35]

▮ A liberty interest that is protected by the United States Constitution may also be created by state law.[36] In *Sandin v.*

**30.** Diaz also argues that she had a property interest in the right to participate in the electronic monitoring program. Because she raised this issue for the first time in her reply brief, we deem it waived. *See Maines v. Kenworth Alaska, Inc.,* 155 P.3d 318, 326 (Alaska 2007) (citing *Crittell v. Bingo,* 83 P.3d 532, 536 n. 19 (Alaska 2004)).

**31.** *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

**32.** *Larson v. Cooper,* 90 P.3d 125, 135 (Alaska 2004) (quoting *Matson v. Commercial Fisheries Entry Comm'n,* 785 P.2d 1200, 1206 (Alaska 1990)).

**33.** *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting the Due Process Clause of its own force protects an interest in freedom from restraint exceeding the sentence in an unexpected manner); *see also Larson,* 90 P.3d at 134 ("[U]nder the federal constitution's Fourteenth Amendment, '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' ") (quoting *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460–61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

**34.** *See Morrissey v. Brewer,* 408 U.S. 471, 480–82, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). This is the case in Alaska, where "the time [a] parolee was at liberty on parole does not alter the time the parolee was sentenced to serve." AS 33.16.240(f). In *Young v. Harper,* the United States Supreme Court held convicts in Oklahoma's pre-parole program had the same liberty interest as those in its parole program because the two programs were distinct in name only. 520 U.S. 143, 144–45, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997). In that program both parolees and pre-parolees were eligible for deductions against their sentences for time spent on parole. *Id.* at 149, 117 S.Ct. 1148.

**35.** *See Sandin,* 515 U.S. at 476, 484, 487, 115 S.Ct. 2293 (rejecting argument that prisoner had a liberty interest under the Due Process Clause in remaining free from disciplinary segregation because the underlying record of misconduct would not inevitably affect sentence duration); *Larson,* 90 P.3d at 134 (citing *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)) ("[T]he guarantee of due process does not provide . . . a right to avoid segregation from the general prison population.").

**36.** *Sandin,* 515 U.S. at 483–84, 115 S.Ct. 2293 ("States may under certain circumstances create liberty interests which are protected by the Due Process Clause.").

*Conner,* a civil rights suit brought by a prisoner, the United States Supreme Court held that generally the only state-created liberty interests protected by the Fourteenth Amendment are those in freedom from restraints which "impos[e] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." [37]

DOC's policies and procedures manual describes the electronic monitoring program as "[a] form of incarceration for offenders" [38] that provides "a cost effective alternative to the use of hard correctional facility beds for appropriate prisoners." [39] To participate in the electronic monitoring program a prisoner must meet certain criteria, including being within two years of a projected release date and being assigned to either the minimum or medium custody level.[40] The DOC manual provides that if a participant does not comply with program requirements, she will be returned to a correctional center or community residential center and reassigned to a new custody level through a designation process.[41]

Although Diaz argues her removal from the electronic monitoring program deprived her of her liberty interest in rehabilitation as created by article I, section 12 of the Alaska Constitution,[42] transferring Diaz back to an institutional prison did not create an atypical or significant hardship in comparison to ordinary prison life because it was simply a return to ordinary prison life.[43] Nor did segregating Diaz from the general prison population for less than a day [44] or restricting her telephone privileges for two days [45] create an atypical or significant hardship. Therefore Diaz did not have a state-law-based liberty interest protected by the federal constitution in continued participation in

**37.** *Id.* at 484, 115 S.Ct. 2293; *accord Larson,* 90 P.3d at 135.

**38.** State of Alaska Department of Corrections Policies and Procedures (P & P) Definition 818.14(B).

**39.** P & P Purpose 818.14.

**40.** P & P Procedure 818.14(A)(4).

**41.** P & P Procedure 818.14(G). We also note that AS 33.30.065(c) provides:

> A decision by the commissioner to designate a prisoner to serve a term of imprisonment or a period of temporary confinement, or a part of the term or period, by electronic monitoring does not create a liberty interest in that status for the prisoner. The prisoner may be returned to a correctional facility at the discretion of the commissioner.

This statutory provision, although not determinative in our independent review, indicates that the legislature did not intend to create a liberty interest in participation in the electronic monitoring program.

**42.** Article I, section 12 of the Alaska Constitution identifies the principle of reformation as one basis of criminal administration. *See, e.g., Ferguson v. State, Dep't of Corr.,* 816 P.2d 134, 139–40 (Alaska 1991) (holding prisoners have protected liberty interest in continued participation in rehabilitation programs based on the reformation clause); *Rathke v. Corr. Corp. of Am., Inc.,* 153 P.3d 303, 306–09 (Alaska 2007) (deeming colorable an inmate's claim that he was entitled to due process before he could be placed in punitive segregation for 30 days because of his state-constitutional interest in rehabilitation).

**43.** *See, e.g., Dominique v. Weld,* 73 F.3d 1156, 1159–61 (1st Cir.1996) (holding removal of convicted prisoner from community work release program did not implicate a state-created liberty interest because "his transfer to a more secure facility subjected him to conditions no different from those ordinarily experienced by large numbers of other inmates serving their sentences in customary fashion").

**44.** *Sandin,* 515 U.S. at 484, 486, 115 S.Ct. 2293 (holding 30 days in administrative segregation "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest" protected by the federal constitution). Because Diaz confined her arguments on appeal to her § 1983 claims under the United States Constitution, whether a prisoner's freedom from punitive segregation is a liberty interest protected by the due process clause of the Alaska Constitution has no bearing on this appeal. *See Brandon v. State, Dep't of Corr.,* 73 P.3d 1230, 1234 (Alaska 2003) (noting that due process guarantee of Alaska Constitution applies more broadly than identical provision of the United States Constitution and that "under the Alaska Constitution punitive segregation of a prison inmate following a major disciplinary infraction is a deprivation of liberty sufficient to trigger the right to due process.") (citing *McGinnis v. Stevens,* 543 P.2d 1221, 1236–37 (Alaska 1975)).

**45.** *Tanney v. Boles,* 400 F.Supp.2d 1027, 1040 (E.D.Mich.2005) (holding telephone restriction for disciplinary reasons is not an "atypical and significant hardship" and therefore did not implicate liberty interest protected by the Fourteenth Amendment).

an electronic monitoring program, in not being placed in segregated confinement, or in enjoying full telephone privileges.

### C. Parlier And His Detective Agency Are Not Liable Under § 1983 For Conspiring To Violate Diaz's Fourth And Fourteenth Amendment Rights Because Those Rights Were Not Violated.

Diaz asserts that private parties "are liable under 42 U.S.C. § 1983 ... if they willfully participate in a joint action with State officials to deprive another of ... constitutional rights." Parlier responds that "[a]ny claim for damages under § 1983 requires a violation of a constitutionally protected right." We agree that Parlier and his detective agency were entitled to summary judgment because they could not have conspired with state actors to deprive Diaz of her constitu-

**46.** *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (noting § 1983 recovery against a private entity for conspiracy requires proof of a deprivation of a right secured by the Constitution or laws of the United States).

**47.** Having determined that Diaz's Fourth and Fourteenth Amendment rights were not violated,

tional rights, given that the officer-escorted trip to and interrogation at the travel agency, the transfer back to jail, the temporary segregated confinement, and the telephone restrictions did not deprive her of those rights.[46]

## V. CONCLUSION

For the reasons stated above, we AFFIRM the summary dismissal of Diaz's claims.[47]

EASTAUGH, Justice, not participating.

we do not reach her argument that the defendants were strictly liable under § 1983 or the DOC officers' argument that they were entitled to qualified immunity.